**In re TERRENCE.**

[Cite as *In re Terrence*, 162 Ohio App.3d 229, 2005-Ohio-3600.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–05–1018.

Decided July 13, 2005.

Donna M. Grill, for appellant.

Julie T. Williamson, for appellee.

SINGER, Presiding Judge.

{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights of the mother of the minor child, Terrence S. Because we conclude that the mother's consent was not voluntarily or knowingly given, we reverse.

{¶ 2} In February 2004, the Lucas County Children Services Board ("LCCSB") was awarded temporary custody of Terrence S. after he was adjudicated a dependent and neglected child. In August 2004, the juvenile court approved the LCCSB case plan, which indicated that the mother was making progress and reunification was the goal. In September 2004, LCCSB filed a motion for permanent custody. At that time, the mother was incarcerated because of

alleged probation violations. Pursuant to mediation, on October 22, 2004, the father consented on the record to the award of permanent custody to LCCSB. The mother participated in the mediation discussions via telephone and, on October 26, 2004, was conveyed to the juvenile court to place her agreement on the record.

{¶ 3} At the hearing, an agreement was read into the record by the mother's counsel indicating that the mother was to stipulate that "the child cannot and should not be returned to the care of either parent and that the award of permanent custody [to LCCSB] is in the best interest of the child." The mother was also to stipulate that "the parents have failed to remedy the problems which caused the [child] to be removed * * * and * * * that Children Services Board has made a reasonable effort to finalize a permanent plan for the child." The mother's counsel also asked to put on the record that "the parent did make * * * what we understand to be, an unenforceable agreement, but sort of a moral agreement with the potential adoptive parents stating that there would be some ability to—for them to send photographs back and forth, probably to a post office box, so that they could have some sense as [the father's] family and we understand [the mother] understands that that is not something that the Court can enforce but also hoping that that will take place and that is part of the mediation."

{¶ 4} When counsel then inquired of the mother regarding her consent to the mediation agreement, the following exchanges took place:

{¶ 5} "[Counsel] Q. Okay. Did you feel that you were able to participate accurately in that mediation?

{¶ 6} "[Mother] A. I guess, yes.

{¶ 7} "Q. Okay. And did you agree to this, did you agree to this agreement that we've read into the record?

{¶ 8} "A. Your Honor, may I ask you a question first?

{¶ 9} "THE COURT: Sure.

{¶ 10} "If—

{¶ 11} "THE COURT: If I can answer it, I will answer it. If not—

{¶ 12} "Okay, if I wanted to fight, do me and his dad go together?

{¶ 13} "THE COURT: I'm sorry I didn't hear that.

{¶ 14} "If I fought with [the father], would [the father] have to fight too? Does both of our stuff go together?

{¶ 15} "THE COURT: That's a question I can't answer. Your Attorney can answer.

{¶ 16} The mother and her attorney then had a discussion off the record and counsel then again addressed the mother on the record:

{¶ 17} "Q. So you heard the agreement. Are you willing to agree to this agreement as it's been read on the record?

{¶ 18} "I said I could give him presents and letters? That's in there?

{¶ 19} "Q. Yes, it is, and then again, that's part of that informal agreement. You understand that you—you understand the idea of permanent custody, correct?

{¶ 20} "A. Yeah.

{¶ 21} "Q. Okay. And you—do you understand that you would be giving up permanent custody of your son to Children Services with the plan of adopting him, having him find adoptive parents?

{¶ 22} "A. Yeah.

{¶ 23} "Q. Okay. Have you made this agreement of your—voluntarily?

{¶ 24} "A. Yeah.

{¶ 25} "Q. Okay. And I have talked to you about this, I have given you legal advice. Are you satisfied with the legal advice I have gave you?

{¶ 26} "A. Uhum.

{¶ 27} "Q. Okay. Thank you.

{¶ 28} "THE COURT: Miss [S], do you know why you're here today?

{¶ 29} "Yes, sir.

{¶ 30} "THE COURT: Tell me why you're here today.

{¶ 31} "Because I'm—they want—because I'm in jail. I can't have—

{¶ 32} "THE COURT: I didn't hear you.

{¶ 33} "Because I'm in jail and they want my baby.

{¶ 34} "THE COURT: Okay. And they're asking for permanent custody of your child. Do you know what permanent custody means? What does it mean to you?

{¶ 35} "That he's not my baby anymore.

{¶ 36} "THE COURT: Okay. And you're severing, giving up all rights to your baby, is that right?

{¶ 37} "I don't want to.

{¶ 38} "THE COURT: I'm sorry, I didn't hear you.

{¶ 39} "I don't want to."

{¶ 40} The court then recessed and conducted an off-the-record sidebar. Counsel and the mother also discussed the agreement. After further exchanges with counsel about the agreement were placed on the record, the court again spoke with the mother.

{¶ 41} "THE COURT: I know it's a hard agreement to make, but I have to make sure Mrs. [S], that you are doing this intelligently and voluntarily of your own free will. No one has forced you to enter into this agreement?

{¶ 42} "No.

{¶ 43} "THE COURT: No one has threatened you or promised you anything by entering into this agreement?

{¶ 44} "Hoping that I could keep contact with him, but no. What did you ask me? I'm sorry.

{¶ 45} "THE COURT: There's no, you know, there is no guarantee—there is no guarantee that you can stay in contact with this child, you understand that.

{¶ 46} "[Nods head.] Yes.

{¶ 47} "THE COURT: You knew—I mean, Lucas County Children Services doesn't have to do anything with you today—after today. The child probably will be placed for adoption, a new, adoptive parents don't have to do anything regarding communication of this child with you, you understand that?

{¶ 48} "Yes.

{¶ 49} "THE COURT: The chances are that you probably won't see this child ever again, you understand that? You're looking confused.

{¶ 50} "A. I understand what they're saying. I—

{¶ 51} "THE COURT: The alternative to this is that we'll go to trial and the Lucas County Children Services will have to prove its case against you by clear and convincing evidence. You understand that?

{¶ 52} "A. Yes.

{¶ 53} "THE COURT: You will be brought back here for a trial and you, of course, can cross-examine any witnesses that they may have. They—take the witness stand on your own behalf—you understand that?

{¶ 54} "A. Yes.

{¶ 55} "THE COURT: But you're giving up permanent custody, you're giving up those rights, too?

{¶ 56} "A. Yeah.

{¶ 57} "THE COURT: Okay. Do you want to give up permanent custody of your child today?

{¶ 58} "A. I don't want to, but I don't think that I have any other choice but to do this.

{¶ 59} "THE COURT: Could I see counsel at Side Bar?

{¶ 60} Yet another off-the-record discussion was held.

{¶ 61} "THE COURT: Mrs. [S], are you willing to go through with this agreement?

{¶ 62} "A. Yes, sir.

{¶ 63} "THE COURT: And are you willing to permanently give up your child to the Lucas County Children Services.

{¶ 64} "A. Yes.

{¶ 65} "THE COURT: You are sure you're willing to do this?

{¶ 66} "A. Yes.

{¶ 67} "THE COURT: "You're shaking her head no and you're answering the question yes.

{¶ 68} "A. Just, my mind is going. Yes.

{¶ 69} "THE COURT: I'm sorry, I didn't hear you.

{¶ 70} "A. My mind is just going.

{¶ 71} "THE COURT: I know you don't want to give up your child. I wouldn't want to do that either to my child. The Lucas County Children Services Board, if you do not agree to this, will bring a case against you. Whether or not they prevail, I don't know. Do you—would you rather go to trial?

{¶ 72} "A. No. sir.

{¶ 73} "THE COURT: Ok. Why not?

{¶ 74} "A. Because I won't win.

{¶ 75} "THE COURT: Because what?

{¶ 76} "A. I won't win.

{¶ 77} "THE COURT: So in the alternative, you find it is in the best interest that you willingly give up permanent custody of this child?

{¶ 78} "A. Yes, sir.

{¶ 79} "THE COURT: Yes, sir?

{¶ 80} "A. (Nods head.)

{¶ 81} "THE COURT: Court will accept the agreement and you will prepare the entry with the appropriate language?

{¶ 82} "MS. WILLIAMSON: Yes, sir."

{¶ 83} Based upon the mother's statements, the court entered judgment severing parental rights and awarded permanent custody of Terrence to LCCSB. The mother now appeals that judgment, arguing the following assignment of error:

{¶ 84} "The trial court erred in granting permanent custody of the minor child to LCCSB as mother's consent to permanent custody was not voluntarily made."

{¶ 85} Pursuant to R.C. 2151.414(B)(1), a court may grant permanent custody of a child to a state agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency and that any of several enumerated factors apply, including that "(a) [t]he child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

 {¶ 86} The standard for appellate review in a permanent-custody case is whether the trial court had clear and convincing evidence to make an award of permanent custody. *In re Hiatt* (1993), 86 Ohio App.3d 716, 725, 621 N.E.2d 1222. The "clear and convincing evidence" standard is a higher degree of proof than the "preponderance of the evidence" standard generally used in civil cases, but is less stringent than the "beyond a reasonable doubt" standard used in criminal cases. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54. On appeal from an order terminating parental rights, an appellate court will not reverse the trial court's judgment if, upon a review of the record, it determines that the trial court had sufficient evidence to satisfy the clear-and-convincing-evidence standard. *In re Wise* (1994), 96 Ohio App.3d 619, 626, 645 N.E.2d 812.

{¶ 87} In reaching its determinations regarding permanent custody, the trial court must safeguard certain fundamental rights of parents. The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has repeatedly recognized this fundamental liberty interest to include the interest of parents to make decisions concerning the care, education, custody, and control of their children. See, e.g., *Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042; *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070. See, also, *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (parent's right to raise a child is an essential and basic civil right).

{¶ 88} Where parental rights are permanently terminated, "it is of utmost importance that the parties fully understand their rights and that any waiver is made with full knowledge of those rights and the consequences which will follow." *Elmer v. Lucas Cty. Children Serv. Bd.* (1987), 36 Ohio App.3d 241, 245, 523 N.E.2d 540. " 'The rights to conceive and to raise one's children have been deemed 'essential,' * * * 'basic civil rights of man,' * * * and '[r]ights far more precious * * * than property rights.' " (Citations omitted.) *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. "A termination of parental rights is the family law equivalent of the death penalty in a criminal case. The parties to such an action must be afforded every procedural and substantive protection the law allows." *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45.

{¶ 89} We acknowledge that Juv.R. 34 and R.C. 2151.35 do not specifically require a full colloquy for admissions on disposition. See *In re Erich L.*, 6th Dist. No. L–04–1340, 2005-Ohio-2945, 2005 WL 1389086; *In re Lakes*, 149 Ohio App.3d 128, 2002-Ohio-3917, 776 N.E.2d 510. Nevertheless, fundamental due process requires that when a parent is waiving the fundamental right to care for and have custody of a child, the trial court must have a meaningful dialogue with that parent to be certain that the consent is truly voluntary. See *Elmer v. Lucas Cty. Children Serv. Bd.*, supra. If a parent expresses uncertainty or misunderstandings about his or her decision to waive parental rights, the trial court's acceptance of the a waiver is improper. Id.

{¶ 90} In this case, the mother was more than a little reluctant about her decision. When first asked whether she was there to give up custody of her child, she twice said, "I don't want to." She also said she felt she had no other choice, rather than that she believed the choice she was making was in her child's best interest. After 45 minutes, with three separate off-the-record discussions, the mother eventually acquiesced verbally in the relinquishment of her rights. Even the court, however, recognized her ambivalence during the last interchange, noting that while she was answering "yes," she was shaking her head "no." These responses together with the length of time it took to convince the mother to consent demonstrate that the mother's waiver of her rights to custody of her child was made under duress at best, or was coerced, at worst.

{¶ 91} While we do not address the issue of the use of mediation in permanent-custody cases, we must comment because its use here does concerns us, especially as it relates to the voluntariness of the mother's consent to waive her parental rights. In mediation in termination cases, the ultimate goal is for the parent to give up custody of the child. But that can be accomplished anyway if there is sufficient evidence pursuant to R.C. 2151.414(B)(1), so, what is the inducement for the parent to participate in mediation? What benefits will inure to the parent?

Mediating with the government, which has far more resources than an individual, must be carefully scrutinized, as the parties come with unequal bargaining positions. Here, even though the mediation might have been with the prospective adoptive parents, LCCSB was the governmental authority seeking termination of the natural parents' rights. The mother had nothing real to gain and everything to lose. LCCSB had everything to gain and nothing to lose. Mediation is more beneficial to the state, as consent is more efficient than trial. LCCSB can achieve its goal in less time and at less expense, while the mother has nothing more than phantom promises. Here, the circumstances surrounding the mediation are even more troubling. The mother was in jail when the mediation occurred and had to participate by telephone. The record shows that the mother was confused and, in considering whether to give consent, clearly relied on the "moral" agreement by one of the prospective adoptive parents to permit limited contact with the child.

{¶ 92} The waiver of one's parental rights should not be based upon misunderstandings, duress, coercion, or the lack of zealous legal representation. Although a parent may express some regret when consenting to the termination of her rights to raise a child, the waiver should be given because the parent acknowledges that it is in her child's best interest to do so. When considered in its entirety, the record in this case clearly indicates that the mother decided to relinquish her parental rights because she believed she had no other choice and because she had been told that further contact with the child would be possible, not because she believed it was in her child's best interest. Thus, the waiver was not truly voluntary or knowing. Since the mother's uncertainty was apparent from her first responses, the trial court should have simply stopped the proceeding and rescheduled the hearing. A continuance could have provided an opportunity under less stressful conditions for the mother to discuss her options with counsel.

{¶ 93} We conclude, therefore, that the trial court erred in accepting the mother's waiver of her rights to custody of her child and in granting permanent custody to LCCSB. As a result, this case must be remanded for appropriate proceedings as to the motion for permanent custody, either a full hearing with evidence presented by the parties regarding the permanent-custody issues or for further inquiry into the mother's consent.

{¶ 94} Accordingly, appellant's sole assignment of error is well taken.

{¶ 95} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed and the cause is remanded for proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal, for which sum

judgment is rendered against appellee on behalf of Lucas County and for which execution is awarded. See App.R. 24.

Judgment reversed
and cause remanded.

SKOW, J., concurs.

PARISH, J., concurs separately.

DENNIS M. PARISH, Judge, concurring.

{¶ 96} I concur with the majority's ultimate decision in this matter. However, I cannot agree with the comments found in ¶ 91 of the opinion, concerning the use of mediation in permanent-custody cases, for the following reasons.

{¶ 97} First, after stating that the use of mediation in terminating appellant's parental rights is not an issue in this appeal, the majority offers speculative comments, such as "the ultimate goal [of mediation] is for the parent to give up custody of the child" and "[m]ediating with the government * * * must be carefully scrutinized, as the parties come with unequal bargaining positions," which are immaterial to an analysis of the issues in this case. Second, as noted by the majority, termination of parental rights can be accomplished through the state's presentation of sufficient evidence pursuant to R.C. 2151.414(B)(1). We agree that sufficient evidence does not exist in this case. Accordingly, our decision would be better reasoned without the inclusion of ¶ 91.

{¶ 98} If, or when, the issue of mediation in the juvenile-justice system is ever properly before this court, I am prepared to participate in a well-reasoned analysis, based on the facts and existing case law. However, it is not the function of this, or any, appellate court to provide sneak previews of coming attractions by issuing what amounts to an advisory opinion on a matter we have not been asked to address. See *State ex rel. White v. Koch,* 96 Ohio St.3d 395, 2002-Ohio-4848, 775 N.E.2d 508, at ¶ 17.