[Cite as *In re K.C.*, 2015-Ohio-3815.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

IN RE:

K.C.                                          CASE NO.  4-15-05

DEPENDENT CHILD.

O P I N I O N

[MELISSA SCHWINNEN - APPELLANT].

IN RE:

C.C.                                          CASE NO.  4-15-06

DEPENDENT CHILD.

O P I N I O N

[MELISSA SCHWINNEN - APPELLANT].

Appeals from Defiance County Common Pleas Court
Juvenile Division
Trial Court Nos. 31435 and 31436

Judgments Reversed and Cause Remanded

Date of Decision:   September 21, 2015

APPEARANCES:

*Timothy C. Holtsberry*  for Appellant

*Russell R. Herman*  for Appellee

**SHAW, J.**

{¶1} Mother-appellant, Melissa Schwinnen ("Melissa"), appeals the March 2, 2015 judgment of the Defiance County Court of Common Pleas, Juvenile Division, granting the motion for permanent custody filed by plaintiff-appellee, Defiance County Department of Job and Family Services (the "Agency"), and terminating her parental rights. Melissa raises the following assignments of error on appeal.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN ACCEPTING THE CONSENT OF THE MOTHER VIA AFFIDAVIT AS THAT CONSENT DID NOT COMPLY WITH JUVENILE RULE 29(D).**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED IN ACCEPTING THE CONDITIONAL CONSENT VIA AFFIDAVIT OF THE MOTHER WHEN ALL CONDITIONS OF THE AFFIDAVIT WERE NOT MET.**

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN ACCEPTING MOTHER'S CONSENT VIA AFFIDAVIT IN VIOLATION OF THE HEARSAY RULE.**

### ASSIGNMENT OF ERROR NO. IV

**APPELLANT WAS DENIED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶2} On June 26, 2013, the Agency filed a complaint alleging Melissa's children C.C. (born in 2012) and K.C. (born in 2013) to be dependent children. The complaint was filed shortly after K.C.'s birth, at which time K.C. tested positive for cocaine on a toxicology screen. Melissa admitted to the drug use and further admitted that others in the home where she cared for then one-year-old C.C. also abused drugs. Based on Melissa's drug use during pregnancy, the complaint also alleged K.C. to be an abused child.[1] The children were placed in the temporary custody of the Agency pursuant to an ex parte order issued by the trial court.

{¶3} On July 3, 2013, the trial court appointed a Guardian Ad Litem ("GAL") to the case.

{¶4} On September 5, 2013, Melissa and the children's father Charles ("Blake") C. appeared in open court with counsel.[2] Melissa entered a plea of "Not True" to the dependency and abuse allegations contained in the complaint. Blake entered a plea of "Not True" to the Agency's abuse allegation regarding K.C. and entered a plea of "True" to the dependency allegations regarding both children. The parties stipulated and agreed that continuing the Agency's temporary custody of the children during the pendency of the action was in their best interest.

---

[1] The record indicates that C.C. also tested positive for cocaine at the time of his birth in 2012.
[2] Blake's paternity was later established as the result of court-ordered genetic testing.

-3-

{¶5} On October 7, 2013, the trial court held an adjudication hearing. Melissa was not present due to her incarceration on drug related offenses. Nevertheless, her attorney submitted to the trial court a three-page affidavit signed by Melissa changing her plea from "Not True" and entering a plea of "True" to the allegation of dependency regarding both C.C. and K.C. The trial court found that Melissa's plea was entered knowingly, intelligently and voluntarily. The Agency moved to dismiss the abuse allegation concerning K.C. Consequently, the trial court accepted both parents' pleas and found the children to be dependent. The trial court further found that continuing the Agency's temporary custody was in the children's best interest and ordered the same. Disposition of the case was continued for a later date.

{¶6} On May 21, 2014, the Agency filed a motion requesting the trial court extend its temporary custody of the children for six months. The record indicates that Melissa was still incarcerated at the time with a release date in the fall of 2015. However, the motion stated that Blake had made some progress in complying with the case plan and the Agency requested the trial court grant additional time for Blake to attempt to complete the case plan objectives. After conducting a hearing, the trial court granted the Agency's motion to extend its temporary custody of the children for six months.

{¶7} On September 3, 2014, the Agency filed a motion for permanent custody of the children. In support of its motion, the Agency stated that the children had been in its temporary custody for twelve or more months of the past consecutive twenty-two month period. The Agency further noted that Melissa was serving a two-year prison term for drug related offenses and that Blake had made minimal progress with the case plan. Blake also informed the Agency that he did not want to continue to work with the Agency toward reunification and that he had no intention of attending any further hearings in the matter.

{¶8} On October 28, 2014, the trial court conducted a semi-annual review of the case and continued the Agency's temporary custody of the children.

{¶9} On January 23, 2015, Melissa filed a motion for legal custody in which she requested that the trial court grant legal custody of the children to Blake's grandmother, Linda Claud, the children's paternal great-grandmother. Melissa acknowledged that naming Linda Claud legal custodian of the children would provide her with residual parental rights, rather than terminating those rights.[3]

{¶10} On January 29, 2015, the GAL filed her report in the case recommending that the trial court grant the Agency's motion for permanent custody so that the children may be placed for adoption. In her report, the GAL

---

[3] We note that Linda Claud was never made a party to the case.

voiced her concerns with Linda Claud being named legal custodian. Specifically, the GAL noted that Linda was 72-years-old at the time of the hearing and questioned her ability to care for the two very young children.

{¶11} On February 3, 2015, Melissa filed a three-page affidavit which stated the following with regard to the Agency's motion for permanent custody.

> **Melissa Schwinnen, being first duly cautioned and sworn, states as follows:**
>
> **1.    I am the mother of [K.C.] and [C.C.].**
>
> **2.    I have received a copy of the State's Motion for Permanent Custody filed September 3, 2014.**
>
> **3.    I have reviewed the Motion for Permanent Custody and understand it.  I have had the opportunity to speak with my attorney, [] by phone with any questions I have regarding the motion.**
>
> **4.    I understand that if permanent custody of the children is awarded to the State, my parental rights and responsibilities will be forever terminated.  I understand that I will have no legal rights to visitation, custody, or any other rights or responsibilities with respect to the children.**
>
> **5.    I understand that if the State acquires permanent custody and places the children with Linda Claud, Mrs. Claud has no legal duty to allow me to visit or communication with the children, and that I will not have the legal right to demand visitation or communication with the children if she chooses to deny such contact.**
>
> **6.    I understand that an alternative to permanent custody is legal custody to Linda Claud.  I understand that if the Court awards legal custody [to] Linda Claud, my paternal rights and responsibilities would not be terminated.  I understand that my**

**attorney has filed a Motion for Legal Custody to place the children with Linda Claud in order to preserve my parental rights and responsibilities as an alternative to permanent custody.**

**7. I hereby permit my attorney to withdraw the Motion for Legal Custody to Linda Claud.**

**8. I hereby consent to the State's motion for permanent custody of my children.** *I give this consent in reliance upon the State's representations that it will place the children with Linda Claud for adoption.*

**9. I consent to Linda Claud adopting the children.**

**10. I understand that my voluntary surrender of the children** *on the conditions set forth herein* **cannot be revoked or modified once granted. I understand that an order will be entered which will forever terminate my parental rights and responsibilities.**

**11. I understand that Revised Code Section 2151.414(E)(11) lists as a factor in determining whether the children cannot be placed with me within a reasonable time that the "parent has had parental rights <u>involuntarily</u> terminated with respect to a sibling of the child…" (emphasis added). I have decided to <u>voluntarily</u> consent to termination of my parental rights in order to preserve my rights as to children I give birth to or adopt hereafter.**

**12. I believe permanent custody as set forth herein is in the best interests of my children.**

**13. I have signed this Affidavit knowingly, willingly, and intelligently. I was not coerced to sign, have had adequate time to consider whether signing would be in my best interests, and have signed of my own free will.**

**14. I have no medical conditions that would prevent me from understanding the effect of executing this affidavit. I am not**

> **under the influence of any medications or other substances that affect my understanding or comprehension.**
>
> **15. I have had adequate time to consult with my attorney [], concerning this Affidavit, and any questions I had have been answered to my satisfaction.**

(Doc. No. 64) (emphasis added).

{¶12} On February 5, 2015, the trial court conducted a hearing on the Agency's motion for permanent custody. Melissa was not present at the hearing due to her incarceration. Melissa's attorney presented the trial court with the affidavit expressing Melissa's consent to the Agency's motion for permanent custody. The trial court noted the unusual method of conveying a party's voluntary surrender of parental rights by affidavit and further inquired of Melissa's attorney to ascertain whether she was knowingly, intelligently, and voluntarily waiving her right to require the Agency to prove its case against her and consenting to the termination of her parental rights. Melissa's attorney relayed his prior conversations with her to the trial court in the following exchange at the permanent custody hearing.

> **Counsel: So I talked to her, it would have been February 3rd on the telephone. She acknowledged that she had received my letter, she understood it. She also understood that it would— because of the statute that's reflected in the paragraph eleven of the affidavit, it would be in her interests not to have an involuntary termination of her parental rights for that reason and she was willing to voluntarily consent to permanent custody to the State. She said she's been in contact with Linda Claud as well. She understands that permanent custody here is to the**

**State and not to Linda Claud. The State will try to place the children with Linda, but that was a discussion we had over the telephone and then I talked to the case manager after speaking with her. The case manager had me email the affidavit to her and then she emailed it back after Melissa signed it. She scanned it in and emailed it back and then I filed it.**

**Trial Court: Well I guess my question then and I can't, you know, I can't ask her directly because she's not here obviously, but and maybe you can answer this and maybe you can't, but what was her motivation for filing this affidavit? Why didn't she just let the proceedings proceed and force the State to present their evidence and—**

**Counsel: Sure. I guess paragraph eleven of the affidavit would be the way to address that. It eliminates—there are many factors, but it eliminates this one factor as the basis for any future children she may have because she is only in her mid-twenties. An involuntary termination can be used as a factor that the State can use to allege that future children cannot be placed with her within a reasonable time. So for that reason I think she believed that voluntary consent was in her interest.**

**Trial Court: Okay. Alright. So this was something you had discussed with her. She felt that it might be better to voluntarily consent given her circumstances of being incarcerated under a lengthy sentence in a state facility, is that correct?**

**Counsel: That's correct.**

**\* \***

**Trial Court: So were you satisfied then from your discussions with her and your involvement with her that she understands the absolute permanency of this, that this just cannot be undone and she can't come back later on when she eventually gets out of prison and say, "you know, I'm okay now and I'd like to have my kids back?"**

**Counsel:** Absolutely I do, Your Honor. Based on my discussions with her—when I talked to her on February 3rd, it was as though she was ready to go with this affidavit the way it's written. She said, "absolutely this is the way to go, I read your letter and I understand it, I understand this is permanent." She's hoping I think the children end up with Linda and she's hoping that Linda allows her to interact with the children going forward, but I think she understands we don't live in a perfect world and those things may not happen.

**Trial Court:** They may not happen at all.

**Counsel:** That's correct.

**Trial Court:** Okay.

**Counsel:** So I think she knows she's operating in an imperfect world at this point. She knows she's in no position right now having been incarcerated for basically this whole case. She's really in no other position but to consent to permanent custody.

**Trial Court:** Okay and she says in the affidavit here and I understand you may have typed it up, but she says she has knowingly, willingly, and intelligently signed this affidavit.

**Counsel:** Um-hum.

**Trial Court:** What brought you to that conclusion to include that language?

**Counsel:** Well, based on my interactions with her in person prior to her incarceration, she is intelligent. She's actually an intelligent person. She—in talking with her on February 3rd, it was clear that she believed that this was best, that she didn't feel—she understood that I had a Motion for Legal Custody pending and that there was an alternative, okay?

**Trial Court:** Um-hum.

-10-

> **Counsel: And it wasn't like you have no choice, you have to sign this. I told her I can go forward on the Motion for Legal Custody. If we're successful on that then your parental rights would be preserved. That's an option here. So she understood there were some options.**
>
> **Trial Court: I guess that alleviates some of my concern then is that she didn't feel that she was trapped in prison and she had no other alternative available to her but to sign this affidavit. Is that your opinion?**
>
> **Counsel: That's correct, Your Honor.**
>
> **\* \* \***
>
> **Trial Court: \* \* \* I'm satisfied with—it's very unusual to not have the mother here and I understand the circumstances are that she can't be here. It's unusual to have an affidavit appear in a case like this which you all know, but I guess I do understand her motivation of wanting to do this in a voluntary fashion rather than risk there being some kind of involuntary termination. I understand that so I'm willing to accept that affidavit and her position and your representations on her behalf[.]**

(Doc. No. 86 at 10-15).

{¶13} Blake was also present at the hearing with counsel and expressed his intention to voluntarily terminate his parental rights and consent to the Agency's motion for permanent custody. The trial court engaged in a lengthy dialogue with Blake to ensure that he understood the legal consequences of his decision and to verify that Blake was knowingly, intelligently, and voluntarily consenting to the termination of his parental rights.

**{¶14}** The trial court also heard from Linda Claud and inquired about her ability to care for two young children. The GAL also spoke at the hearing and gave her recommendation that the Agency's permanent custody motion should be granted and the children be placed for adoption.

**{¶15}** On March 2, 2015, the trial court issued its judgment entry granting the Agency's motion for permanent custody. Based on her attorney's representations of his conversations with Melissa regarding the matter, the trial court accepted her affidavit and found that she "knowingly, intelligently, and voluntarily consents to the termination of her parental rights with full understanding and knowledge as to the effect thereof." (Doc. No. 68 at 2). Similarly, the trial court also found "[a]fter full inquiry" that Blake "knowingly, intelligently, and voluntarily" consented to the termination of his parental rights. (Id. at 2-3). The trial court then made the following findings:

> **In light of the parents' consent to the termination of their parental rights and considering the underlying factors which support the Agency's Motion, the Court finds the Agency has met its burden of proof by clear and convincing evidence that the children has [sic] been in the custody of the Agency for over twelve (12) of the past twenty-two (22) month period. Furthermore, the Court specifically finds that the children cannot or should not be placed in their parents' care within a reasonable period of time because they have failed to follow the objectives of the case plan, and thus have failed to rectify the problems that initially caused the children to be removed from their custody.**

> **Having considered all of the statutory factors in Ohio Revised Code Section 2151.414(D)(1) and with particular emphasis on the opinions of the Guardian Ad Litem as expressed in her report, the Court finds it is in the best interest of the children that they be placed in the permanent custody of the Agency so that they may be made available for adoption. The Court further finds that the Agency has made reasonable efforts to prevent the continued removal of the children from [their] parents' care. Therefore, the Court finds that the Agency's Motion for Permanent Custody of [K.C.] and [C.C.] is well taken.**

(Doc. No. 68 at 2-3).

{¶16} Melissa subsequently filed this appeal, asserting four assignments of error.

*First, Second, and Third Assignments of Error*

{¶17} In her first, second, and third assignments of error, Melissa contends that the trial court erred in accepting her affidavit conveying her consent to the Agency's motion for permanent custody and to voluntarily terminate her parental rights.

{¶18} Initially, we note that a parent has a " 'fundamental liberty interest' in the care, custody, and management of [his or her] child" and "the right to raise one's children is an 'essential' and 'basic civil right.' " *In re Murray,* 52 Ohio St.3d 155, 157 (1990). "In a case where parental rights are permanently terminated, it is of utmost importance that the parties fully understand their rights and that any waiver is made with full knowledge of those rights and the

consequences which will follow." *Elmer v. Lucas Cty. Children Serv. Bd.*, 36 Ohio App.3d 241, 245, (6th Dist.1987). "[F]undamental due process requires that when a parent is waiving the fundamental right to care for and have custody of a child, the trial court must have a meaningful dialogue with that parent to be certain that the consent is truly voluntary." *In re Terrence*, 6th Dist. Lucas No. L-05-1018, 2005-Ohio-3600, ¶ 89. Thus, the parties to such an action "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). If a parent expresses uncertainty or misunderstandings about his or her decision to waive parental rights, the trial court's acceptance of the waiver is improper. *In re Terrence* at ¶ 89.

{¶19} As acknowledged by the trial court, the circumstances of the present case are somewhat unusual. In addition, this is a case of first impression in this Court. Melissa was incarcerated at the time of the permanent custody hearing and was not present. Nevertheless, her trial counsel appeared on her behalf and presented the trial court with the affidavit dated February 3, 2015 in which Melissa purported to consent to the Agency's motion for permanent custody and to the voluntary termination of her parental rights. The question before us is whether this affidavit was sufficient to comply with the relevant case authority governing a parent's waiver and voluntary termination of parental rights.

**{¶20}** Prior to accepting her consent to the termination of her parental rights, the trial court was required to ascertain whether Melissa fully understood her rights and that her waiver was made with full knowledge of those rights and the attendant consequences. We might question whether this determination can ever properly be made based entirely upon an affidavit and dialogue with counsel alone. Moreover, we have serious reservations as to the stated motivation for any waiver of parental rights being based, as it was in this instance, upon the anticipation that the failure to do so in the current situation might prejudice the Agency and/or the court toward that parent with regard to the possible removal of a future child.

**{¶21}** However, in this instance, it is not necessary to address these concerns because the wording of this particular affidavit fails to establish that Melissa truly understood the nature and extent of her waiver. Specifically, the affidavit contains inconsistent statements regarding Melissa's understanding of permanent custody, the effect on her parental rights, and the potential adoption of the children by Linda Claud. More importantly, the affidavit also explicitly places a condition on Melissa's consent in stating that "I give this consent in reliance upon the State's representations that it will place the children with Linda Claud for adoption. * * * I understand that my voluntary surrender of the children on the

conditions set forth herein cannot be revoked or modified once granted." (Doc. No. 64 at ¶¶ 6, 8)

{¶22} While perhaps not as persuasive, it is also noteworthy that Melissa submitted a letter to the trial court after its grant of the Agency's motion for permanent custody stating her confusion regarding the parameters of permanent custody and her understanding that her consent was conditional upon the "State" permitting Linda Claud to adopt the children. Clearly, any of these "misunderstandings" on Melissa's part could have been addressed by the trial court prior to accepting her "consent" had the trial court held a "meaningful dialogue" with Melissa.

{¶23} It is apparent from the record that the trial court tried to satisfy the "meaningful dialogue" requirement through its discussion with Melissa's trial counsel at the permanent custody hearing. However, trial counsel's narrative of Melissa's comprehension regarding the waiver and voluntary termination of her parental rights does not comport with the language of the affidavit itself. Given the contingencies and inconsistencies in the affidavit previously discussed, trial counsel's reassurances to the trial court at the permanent custody hearing were simply not an adequate substitute for Melissa's own acknowledgement on the record of the ramifications of her decision to enter her consent and voluntary waiver of parental rights.

{¶24} We note that the trial court engaged in an extensive discussion with Blake on the record at the permanent custody hearing regarding the waiver and voluntary termination of his parental rights, which we believe was a good example of a "meaningful dialogue" under these circumstances. When comparing the approach used by the trial court to ascertain the knowing, intelligent, and voluntary nature of Blake's decision to enter his consent to the one afforded to Melissa, the disparity and incongruence between the procedures is palpable.[4]

{¶25} In sum, the internally inconsistent statements in the affidavit expressing Melissa's comprehension as to the nature of permanent custody and the explicit conditional elements contained in the affidavit seriously undermined the requisite and crucial demonstration that Melissa's waiver and voluntary termination of her parental rights was made with her full knowledge of those rights and the consequences. Therefore, we conclude that this flawed affidavit coupled with the lack of a meaningful dialogue between the trial court and Melissa rendered the trial court's acceptance of her consent to the voluntary termination of her parental rights improper.

{¶26} We acknowledge that the trial court also made findings in its judgment entry which appear to support an involuntary termination of parental

---

[4] The relevant case authority does not specify the underlying mechanics of how this "meaningful dialogue" is to take place—i.e., whether the exchange must be made in open court with the parent present. Thus, we see no reason to exclude the possibility of the trial court satisfying this requirement by the use of telephone or video conference or by other means at the trial court's disposal.

rights based on the children being in the custody of the Agency for over twelve of the twenty-two month period and the trial court's conclusion that the children cannot or should not be placed in their parents' care within a reasonable period of time. However, the record reveals that the Agency presented no evidence at the permanent custody hearing to substantiate these findings. In fact, had the Agency taken the minimal steps to present evidence, subject to cross-examination, of the duration of the children's time in the Agency's temporary custody, the length of Melissa's prison sentence, and both parent's non-compliance with the case plan, the trial court may have had sufficient grounds to terminate Melissa's parental rights without her consent. Unfortunately, the present record fails to establish any of the evidence necessary to issue a judgment based upon the involuntary termination of Melissa's parental rights.

{¶27} Accordingly, we conclude that the trial court committed reversible error when it granted the Agency's motions for permanent custody and we sustain Melissa's first, second, and third assignments of error.

*Fourth Assignment of Error*

{¶28} In her fourth assignment of error, Melissa claims her trial counsel was ineffective for a variety of reasons. However, given our disposition of the first three assignments of error, the arguments under this assignment of error are rendered moot and we decline to further address the issues raised therein.

**{¶29}** Based on the foregoing, the judgments are reversed and the causes remanded for further proceedings consistent with this opinion.

*Judgments Reversed and*
*Causes Remanded*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**